**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| ANNIE M. WASHINGTON, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. H-06-2758 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff Annie M. Washington ("Washington") and Defendant Michael J. Astrue,[1] Commissioner of the Social Security Administration ("Commissioner"), cross-motions for summary judgment. Washington appeals the determination of an Administrative Law Judge ("ALJ") that she is not entitled to receive Title II disability insurance benefits. *See* 42 U.S.C. §§ 416(i), 423. Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, this Court is of the opinion that Washington's Motion for Summary Judgment (Docket Entry No. 13) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) should be granted, and the Commissioner's decision denying benefits be affirmed.

---

[1] Michael J. Astrue was sworn in as Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should therefore be substituted for Jo Anne B. Barnhart (former Commissioner) and Linda S. McMahon (interim acting Commissioner) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

I.     *Background*

On July 20, 2004, Washington filed an application for disability insurance benefits with the Social Security Administration ("SSA"), alleging disability starting January 1, 1999.  (R. 62-65).[2] Washington alleges that she suffers from a variety of disabling conditions, including pain in her abdomen, legs, arms, degenerative disk disease, diabetes mellitus,[3] and obesity.  (R. 79, 97).  After being denied benefits initially and on reconsideration, Washington requested an administrative hearing before an ALJ to review the decision.  (R. 25-28, 40).

A hearing was held on January 19, 2006 in Houston, Texas, at which time the ALJ heard testimony from Washington and Kay S. Gilreath, a vocational expert ("VE").  (R. 244-257).  In a decision dated April 4, 2006, the ALJ denied Washington's application for benefits.  (R. 15-22).  On June 2, 2006,  Washington appealed the ALJ's decision to the Appeals Council of the SSA's Office of Hearings and Appeals. (R. 9-11).  The Appeals Council, on July 19, 2006, denied Washington's request to review the ALJ's determination.  (R. 5-7).  This rendered the ALJ's opinion the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Washington filed this case on August 25, 2006, seeking judicial review of the Commissioner's denial of her claim for benefits.  *See* Docket Entry No. 1.

---

[2]  References made to the administrative record (*e.g.*, transcripts, exhibits, and other documents) will be denoted by a "R" followed by the applicable page number(s).

[3]  "Diabetes mellitus" refers to a chronic syndrome of impaired carbohydrate, protein, and fat metabolism owing to insufficient secretion of insulin or to target tissue insulin resistance.  *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 489 (29th ed. 2000).

II.     *Analysis*

    A.    *Statutory Bases for Benefits*

    Social Security disability insurance benefits are authorized by Title II of the Act and are funded by Social Security taxes. *See also* SOCIAL SECURITY ADMINISTRATION, SOCIAL SECURITY HANDBOOK, § 2100. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both *insured* and *disabled*, regardless of indigence. A claimant for disability insurance can collect benefits for up to twelve months of disability prior to the filing of an application. *See* 20 C.F.R. §§ 404.131, 404.315; *Ortego v. Weinberger*, 516 F. 2d 1005, 1007 n.1 (5th Cir. 1975); *see also Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997). Here, Washington stopped working in 1996. (R. 251). Consequently, Washington's Title II insured status expired five years later on March 31, 2001. *See* 20 C.F.R. § 404.131. Thus, to be eligible for benefits, Washington must establish disability on or before her date of last insured ("DLI") of March 31, 2001. (R. 17, 21).

    Applicants seeking benefits under this statutory provision must prove "disability" within the meaning of the Act. *See* 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505(a). Under Title II, disability is defined as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

**B.**   *Standard of Review*

1.   *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact.  The burden of proof, however, rests with the movant to show that there is no evidence to support the nonmoving party's case.  If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case.  *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991).  When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party, and deny the motion if there is some evidence to support the nonmoving party's position.  *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000).  If there are no issues of material fact, the court shall review any questions of law *de novo*.  *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999).  Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

4

2.      *Administrative Determination*

Judicial review of the Commissioner's denial of disability benefits is limited to whether the final decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown*, 192 F.3d at 496.

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve." *Id.*

C.      *ALJ's Determination*

An ALJ must engage in a five-step sequential inquiry to determine whether the claimant is capable of performing "substantial gainful activity," or is, in fact, disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings. *See* 20 C.F.R. § 404.1520(b).

2.  An individual who does not have a "severe impairment" will not be found to be disabled. *See* 20 C.F.R. § 404.1520(c).

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. *See* 20 C.F.R. § 404.1520(d).

4.  If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made. *See* 20 C.F.R. § 404.1520(e).

5.  If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. *See* 20 C.F.R. § 404.1520(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *accord Boyd*, 239 F.3d at 704-05. The claimant has the burden to prove disability under the first four steps. *See Myers*, 238 F.3d at 619. If the claimant successfully carries this burden, the burden shifts to the Commissioner in step five to show that other substantial gainful employment is available in the national economy, which the claimant is capable of performing. *See Masterson*, 309 F.3d at 272; *Greenspan*, 38 F.3d at 236. If the Commissioner is able to verify that other work exists in significant numbers in the national economy that the claimant can perform in spite of her existing impairments, the burden shifts back to the claimant to prove that she cannot, in fact, perform the alternate work suggested. *See Boyd*, 239 F.3d at 705. A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis. *See id.*

The mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992). An individual claiming disability benefits under the Act has the burden to prove that she suffers from a disability as defined by the Act. *See Newton*, 209 F.3d at 452; *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990); *Johnson v. Bowen*, 864 F.2d 340, 343

(5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). A claimant is deemed disabled under the Act only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Shave v. Apfel*, 238 F.3d 592, 594 (5th Cir. 2001); *accord Newton*, 209 F.3d at 452; *Crowley v. Apfel*, 197 F.3d 194, 197-98 (5th Cir. 1999); *Selders*, 914 F.2d at 618; *see also* 42 U.S.C. § 423(d)(1)(A). "Substantial gainful activity" is defined as work activity involving significant physical or mental abilities for pay or profit. *See Newton*, 209 F.3d at 452-53; *see also* 20 C.F.R. § 404.1572(a)-(b).

A medically determinable "physical or mental impairment" is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. *See Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983); *see also* 42 U.S.C. § 423(d)(3). "[A]n individual is 'under a disability, only if [her] impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .'" *Greenspan*, 38 F.3d at 236 (quoting 42 U.S.C. § 423(d)(2)(A)). This is true regardless of whether such work exists in the immediate area in which the claimant resides, whether a specific job vacancy exists, or whether the claimant would be hired if she applied. *See Oldham v. Schweiker*, 660 F.2d 1078, 1083 (5th Cir. 1981); *see also* 42 U.S.C. § 423(d)(2)(A). In the case at bar, when addressing the first four steps, the ALJ determined:

1.      The claimant last met the insured status requirements of the Social Security Act on March 31, 2001.

7

2.      The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 C.F.R. 404.1520(b)).

3.      Through the date last insured, the claimant had the following severe impairments:  obesity, back problems, and diabetes mellitus (20 C.F.R. 404.1520(c)).

4.      Through the date last insure, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform the exertional demands of a wide range of sedentary work, or work which is generally performed while sitting frequently (more or less six hours in an eight-hour workday), standing/walking occasionally (more or less two hours in an eight-hour workday), and does not require lifting in excess of ten pounds occasionally, five pounds frequently.  The claimant's residual functional capacity to perform the exertional demands of the full range of sedentary work is reduced by the following limitations:  occasionally stoop, kneel, and crouch; and, never crawl or climb ropes, ladders or scaffolding.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. 404.1565).

7.      The claimant was born on December 14, 1956 and was forty-two years old on the date last insure, which is defined as a younger individual age 18-44 (20 C.F.R. 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 C.F.R. 404.1564)

9.      The claimant has a skilled work background (20 C.F.R. 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant had acquired work skills from past relevant work that were transferable to other occupations with jobs existing in significant numbers in the national economy (20 C.F.R 404.1560(c), 404.1566 and 404.1568(d)).

11.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through March 31, 2001, the date last insured (20 C.F.R. 404.1520(g)).

(R. 17-21).

This Court's inquiry is limited to a determination of whether there is substantial evidence in the record to support the ALJ's findings and whether the proper legal standards have been applied. *See Masterson*, 309 F.3d at 272; *Watson*, 288 F.3d at 215; *Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452; *Greenspan*, 38 F.3d at 236; *see also* 42 U.S.C. §§ 405(g), 1383(c)(3). To determine whether the decision to deny Washington's claim for disability benefits is supported by substantial evidence, the court weighs the following four factors: (1) the objective medical facts; (2) the diagnoses and opinions from treating and examining physicians; (3) the claimant's subjective evidence of pain and disability, and any corroboration by family and neighbors; and (4) the claimant's age, educational background, and work history. *See Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (citing *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir. 1972)). Any conflicts in the evidence are to be resolved by the ALJ and not the court. *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.

**D.**     *Issues Presented*

Washington claims that the ALJ erred by rejecting the opinion of Washington's treating physician and by failing to fully and fairly develop the record. *See* Docket Entry Nos. 13, 16. Specifically, Washington argues that the ALJ should have consulted a medical expert ("ME") and that the ALJ did not properly consider additional functional limitations as a result of Washington's obesity when determining whether she was disabled. *See* Docket Entry No. 13, 16. The

Commissioner disagrees with Washington's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 15.

      **E.**     ***Review of ALJ's Decision***

           **1.**     ***Objective Medical Evidence and Opinions of Physicians***

When assessing a claim for disability benefits, "[i]n the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work." *Sullivan v. Zebley*, 493 U.S. 521, 525 (1990). If the claimant is not actually working and her impairments match or are equivalent to one of the listed impairments, she is presumed to be disabled and qualifies for benefits without further inquiry. *See id.* at 532; *see also* 20 C.F.R. § 404.1520(d). When a claimant has multiple impairments, the Act requires the Commissioner to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." 42 U.S.C. § 423(d)(2)(B); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000). The relevant regulations similarly provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled.

20 C.F.R. § 404.1523; *see also Loza*, 219 F.3d at 393. The medical findings of the combined impairments are compared to the listed impairment most similar to the claimant's most severe impairment. *See Zebley*, 493 U.S. at 531.

10

The claimant has the burden to prove at step three that her impairment or combination of impairments is equivalent to or greater than a listed impairment. *See id.* at 530-31; *Selders*, 914 F.2d at 619. The listings describe a variety of physical and mental illnesses and abnormalities, and are typically categorized by the body system they affect. *See Zebley*, 493 U.S. at 529-30. Individual impairments are defined in terms of several specific medical signs, symptoms, or laboratory test results. *See id.* at 530. For a claimant to demonstrate that her disorder matches an Appendix 1 listing, it must meet *all* of the specified medical criteria. *See id.* An impairment, no matter how severe, does not qualify if that impairment manifests only some of the specified criteria. *See id.*

For a claimant to qualify for benefits by showing that her unlisted impairment, or combination of impairments, is equivalent to a listed impairment, she must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. *See id.* at 531 (citing 20 C.F.R. § 416.926(a)). A claimant's disability is equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. *See* 20 C.F.R. §§ 404.1526(a). The applicable regulations further provide:

> (1)(i)   If you have an impairment that is described in the Listing of Impairments in Appendix 1 of Subpart P of this chapter, but—
>
> (A)   You do not exhibit one or more of the medical findings specified in the particular listing, or
>
> (B)   You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;
>
> (ii)   We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are at least of equal medical significance.

11

20 C.F.R. § 404.1526(a).   Nonetheless, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Zebley*, 493 U.S. at 531. Ultimately, the question of equivalence is an issue reserved for the Commissioner. *See Spellman v. Shalala*, 1 F.3d 357 (5th Cir. 1993); 20 C.F.R. § 404.1527(e).

A review of the medical records submitted in connection with Washington's administrative hearing reveals that in February 1985, Washington suffered from dyspnea.[4] (R. 232).   Manohar Alloju, M.D. ("Dr. Alloju") ordered a pulmonary function report which suggested that Washington be placed on mild lifestyle restrictions.   (R. 232).   Her height and weight were noted as 67 inches and 319 pounds.   (R. 232).

Four years later, on March 10, 1989, Washington visited Thomas E. Lowe, M.D. ("Dr. T. Lowe").   (R. 160).   Dr. T. Lowe noted that Washington suffered from anemia, obesity, and was borderline diabetic.   (R. 160).   On April 11, 1989, Dr. T. Lowe noted that Washington's anemia had improved.   (R. 160).   On May 23, 1989, Washington complained of heavy vaginal bleeding lasting for thirteen days.   (R. 155).   On June 28, 1989 Joseph Lucci, M.D. ("Dr. Lucci") performed dilatation[5]

---

[4]   "Dyspnea" refers to breathlessness or shortness of breath; difficult or labored breathing. *See* DORLAND'S, *supra*, at 558.

[5]   "Dilatation" refers to the condition, as of an orifice or tubular structure, of being dilated or stretched beyond the normal dimensions. *See* DORLAND'S, *supra*, at 502.

and curettage[6] of the endocervix[7] and endometrium.[8]  (R. 115-116).  The surgical procedure revealed endometritis.[9]  (R. 116).

On March 17, 1992, Washington complained of lower back pain.  (R. 155).  On May 22, 1993, Walter Richard Lowe, M.D. ("Dr. W. Lowe") performed diagnostic arthroscopy,[10] partial lateral meniscectomy,[11] and debridement of arthritic change,[12] lateral compartment, to repair a cartilage tear in Washington's knee.  (R. 126).  Dr. W. Lowe also noted arthritis.  (R. 127).

A visit note on August 31, 1993, reported Washington had been diagnosed as diabetic.  (R. 154, 229-230).  In 1994, Dr. Alloju referred Washington to Marian E. Wulf, M.D. ("Dr. Wulf") for treatment of Washington's continued vaginal bleeding.  (R. 224).  Dr. Wulf prescribed Provera to help control Washington's bleeding.  (R. 224).  On December 15, 1994, Dr. Wulf noted that Washington's vaginal bleeding had subsided since taking the medication.  (R. 225).  On August 16, 1995, and December 21, 1995, Washington was again having heavy vaginal bleeding.  (R. 221).

---

[6]  "Curettage" refers to the removal of growths or other material from the wall of a cavity or other surface, as with a curet.  *See* DORLAND'S, *supra*, at 434.

[7]  "Endocervic" refers to the mucous membrane lining the canal of the cervix uteri; the region of the opening of the uterine cervix in to the uterine cavity.  *See* DORLAND'S, *supra*, at 593.

[8]  "Endometrium" is an alternative for *tunica mucosa uteri. See* DORLAND'S, *supra*, at 594.  "Tunica mucosa uteri" refers to the inner mucous membrane of the uterus, the thickness and structure of which vary with the phase of the menstrual cycle.  *See* DORLAND'S, *supra*, at 1900.

[9]  "Endometritis" refers to inflamation of the endometrium.  *See* DORLAND'S, *supra*, at 594.

[10]  "Arthroscopy" refers to an examination of the interior of a joint.  *See* DORLAND'S, *supra*, at 153.

[11]  "Meniscectomy" refers to an excision of an intra-articular meniscus, as in the knee joint.  *See* DORLAND'S, *supra*, at 1085.

[12]  "Debridement of arthritic change" refers to the removal of foreign material and devitalized or contaminated tissue from or adjacent to a traumatic or infected lesion, specifically an increase of inflamation of a joint, until surrounding healthy tissue is exposed.  *See* DORLAND'S, *supra*, at 151, 329, 460.

13

On April 1, 1996, Washington complained of right hip pain. (R. 217). Dr. Alloju ordered an x-ray and prescribed Vicodin for pain. (R. 217). On April 10, 1996, Washington complained of stiffness in her right leg. (R. 216).

On March 2, 1998, Washington complained of pain in her left hip. (R. 214). On March 23, 1998, Clayton Pedrick, M.D. ("Dr. Pedrick") performed a total abdominal hysterectomy in order to relieve Washington of her vaginal bleeding. (R. 138-139). A surgical pathology report of uterine tissue stated there was no evidence of malignancy. (R. 140).

In 1999, Dr. Alloju noted that Washington was experiencing lower abdomen pain. (R. 213). On February 22, 2000, Washington underwent a diagnostic mammogram which was negative for malignancy. (R. 150-151). On April 25, 2000, Dr. T. Lowe ordered an ultrasound of Washington's abdomen. (R. 148). The report indicated the gallbladder had no evidence of calculi,[13] no dilated biliary ducts, and the liver was somewhat dense. (R. 148). On September 1, 2000, Dr. T. Lowe ordered a CT scan which found clear lung bases, patchy areas on the liver, a normal spleen, a normal pancreas, normal adrenal glands, normal kidneys, normal bowel loops, and no abdominal masses or fluid collections. (R. 147).

---

[13]  "Calculi" refers to abnormal concretion occurring within the body and usually composed of mineral salts. Also called *stone. See* DORLAND'S, *supra*, at 264

On February, 15, 2001, a CT scan of the lower lumbar spine found bilateral spondylolysis[14] at L5[15] without spondylolisthesis,[16] disc degeneration at L5-L1, and no definite disc herniation, however, evaluation of the soft tissues within the canal was limited by the "large body habitus."[17] (R. 145).  On January 4, 2002, an x-ray showed no definite calcifications, normal bowel and gas pattern, and unremarkable lung bases.  (R. 169).

Washington had a consultative examination on December 19, 2002, by Emory E. Mazique, M.D. ("Dr. Mazique").  (R. 177-178).  Dr. Mazique found that Washington could continuously sit and lift ten to twenty pounds in an eight hour work day.  (R. 178).  Dr. Mazique also determined that Washington could frequently stand, lift twenty to fifty pounds, stoop, kneel, squat, crouch, climb, and balance.  (R. 178).  Dr. Mazique further concluded that Washington could occasionally walk, lift ten pounds or less, lift fifty to one hundred pounds, bend, and crawl.  (R. 178).  Dr. Mazique noted that Washington could never lift over one hundred pounds.  (R. 178).

On September 25, 2003, Dr. Mazique gave Washington a second consultative examination. (R. 174-175).  Dr. Mazique found that Washington could continuously sit, stand, lift twenty pounds or less, and climb or balance during an eight hour workday.  (R. 175).  Dr. Mazique reported that Washington could frequently walk, lift twenty to fifty pounds, bend, stoop, kneel, squat, and crouch

---

[14]  "Spondylolysis" refers to dissolution of a vertebra.  *See* DORLAND'S, *supra*, at 1684.

[15]  "L" denotes lumbar vertebrae (L1-L5).  *See* DORLAND'S, *supra*, at 2011.  "Lumbar vertebrae" refers to the five vertebrae between the thoracic vertebrae and the sacrum.  *See id*. at 1958.

[16]  "Spondylolisthesis" refers to forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis.  *See* DORLAND'S, *supra*, at 1684.

[17]  "Large body habitus" refers to the physique; body build and constitution.  *See* DORLAND'S, *supra*, at 780.

during an eight hour workday.  (R. 175).  According to Dr. Mazique, Washington could occasionally crawl and that Washington could never lift over 50 pounds.  (R. 175).

On November 27, 2004, Washington met with Donald Gibson II, M.D. ("Dr. Gibson") for an internal medicine consultative examination. (R. 179-181).  An x-ray of her lumbar spine revealed mild degenerative disk disease, no fractures, no dislocations, no spondylosis, no scoliosis, and a normal curvature.  (R. 180).  An x-ray of her left knee revealed moderate osteoarthritis.[18]  (R. 180).  Dr. Gibson's assessment was that Washington's diabetic condition was stable with no renal, cardiac, or neurologic complications and that her blood sugar and blood pressure were both high. (R. 180).  Dr. Gibson further noted that Washington had arthritis in her knees and back, that she had limited range of motion in the back and could not squat or climb because of arthritis in the knees.  (R.180).  Dr. Gibson assessed Washington's functional residual capacity as being at the sedentary to light level. (R. 180).  Dr. Gibson opined that Washington would require assistance to ambulate for long time periods but that short periods of walking could occur without assistance.  (R. 180).  Concerning Washington's obesity, Dr. Gibson reported that two years earlier Washington weighed 400 pounds but that she had lost weight and, at that time, weighed 325 pounds. (R. 181).  Dr. Gibson noted that Washington was still heavy for her overall size.  (R. 181).

On February 15, 2005, Washington was referred to Lewis K. Clarke, M.D. ("Dr. Clarke") for evaluation of pain and numbness in Washington's hands.  (R. 202).  Dr. Clarke noted that Washington suffered from severe bilateral compression neuropathy at the carpal ligament of the median nerve,

---

"Osteoarthritis" refers to a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and stiffness particularly in the morning or with inactivity.  See DORLAND'S, supra, at 1286.

moderate slowing with compression of the ulnar nerve bilaterally at Guyon's Canal, and mild peripheral neuropathy. (R. 202). On February 18, 2005, Washington underwent a breast mammogram which revealed no evidence to suggest malignancy. (R. 200-201).

On March 11, 2005, Dr. Alloju referred Washington for an MRI. (R. 196-197). The MRI revealed degenerative change at the L5-S1[19] level; marked L5-S1 and mild L3-4 loss of disc height, nuclear dehydration at L5-S1, L3-4 and, to a lesser degree, at L4-5; mild multiple level anterior spondylosis throughout the lower thoracic and lumbar portions of the spine; anterior spondylosis and large chronic anterior protrusion at L5-S1; and no gross paraspinal abnormalities. (R. 196). On April 15, 2005, Dr. Alloju noted the results of an echo reporting suboptimal visualization and mild left ventricular hypertrophy with well preserved contractility. (R. 195, 198). Washington returned to Dr. Alloju for visits on November 3 and 5, 2005, to discuss a mole on the back of Washington's neck. (R. 193-194).

On January 3, 2006, Dr. Alloju noted that Washington was "[d]oing O.K." and that she wanted to get papers for disability. (R. 192). On January 25, 2006, Dr. Alloju filled out a "Lumbar Spine Residual Functional Capacity Questionnaire." (R. 235). Dr. Alloju noted that Washington constantly experienced pain or other symptoms severe enough to interfere with attention and concentration needed to perform even simple work tasks. (R. 236). On the questionnaire, Dr. Alloju marked that Washington could only sit for twenty minutes before needing to stand up; could only stand for five minutes before needing to sit down; and could only sit or stand for less than two hours total in an eight hour work day. (R. 236-237). Dr. Alloju opined that Washington could never lift any amount of

---

[19] "S" denotes sacral vertebrae (S1-S5). *See* DORLAND'S *supra*, at 2015. "Sacral vertebrae," alternative for os sacrum. *See id.* at 1958. "Os sacrum", the wedge-shaped bone formed usually by five fused vertebrae that are lodged dorsally between the two hip bones. *See id.* at 1283.

weight in a competitive work situation.  (R. 237).  Dr. Alloju further noted that Washington could never twist, stoop, crouch, squat, climb ladders, or climb stairs.  (R. 238).

" [O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).  The opinion of a specialist generally is accorded greater weight *than* that of a non-specialist.  *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994), *overruled on other grounds by Sims v. Apfel*, 530 U.S. 103, 108 (2000).  Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings.  *See Scott*, 770 F.2d at 485.  Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown.  *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.  Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.  *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456; *see also Brown*, 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211.  It is well settled that even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

18

In the present case, based on the objective medical facts and opinions of physicians, there is substantial evidence in the record to support the ALJ's determination that Washington suffered from impairments which did not meet or equal the requirements of an Appendix 1 listing through her DLI, March 31, 2001. Washington claims that the ALJ erred by rejecting the opinion of her treating physician, Dr. Alloju. *See* Docket Entry No. 13, p. 4. The Commissioner contends that the ALJ properly rejected the opinion of Dr. Alloju. *See* Docket Entry No. 15, p. 5.

### 2. *Discounting Testimony of Treating Physician*

Washington relies on an MRI taken in 2005 and a questionnaire filled out in 2006, by Dr. Alloju, to show that her condition met or equaled a listing on or before her DLI. *See* Docket Entry No. 13, p. 4, 5. Washington makes a conclusory assertion that the MRI taken in 2005, "helps clarify the degree of impairment [Washington] suffered pre-[DLI]." *Id.* Beyond Washington's mere speculation and conclusory assertion, there is no evidence to support Washington's contention. The MRI shows nothing more than degenerative change at the L5-S1 level; marked L5-S1 and mild L3-4 loss of disc height, nuclear dehydration at L5-S1, L3-4 and, to a lesser degree, at L4-5; mild multiple level anterior spondylosis throughout the lower thoracic and lumbar portions of the spine; anterior spondylosis and large chronic anterior protrusion at L5-S1; and no gross paraspinal abnormalities. (R. 196). Evidence which may concern a later-acquired disability or subsequent deterioration of a previously non-disabling condition is not material. *See Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir. 1985).

Washington also claims that the ALJ erred by improperly discounting the opinion of Dr. Alloju, regarding Washington's alleged inability to work due to her medical conditions. *See* Docket Entry No. 13, p. 5. Treating physician's opinions, however, are far from conclusive and may be assigned

little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237.   The 2006 questionnaire is in direct conflict with two consultative examinations taken in 2002, and 2003, and an internal medicine consultative examination taken in 2004. (R. 174-175, 177-181).  The ALJ properly noted a CT scan, taken near the end of the relevant time period, February 15, 2001, revealing a back condition which does not meet or equal any listed impairment. (R. 19-20, 145).  Other medical evidence in the record make few references concerning Washington's diabetes or obesity.  A visit note on August 31, 1993, reported that Washington had been diagnosed as diabetic.  (R. 154).  The only record evidence showing Washington's obesity impacts her functional limitations concerns the difficulty of imaging hardware to acquire pictures because of her size.  (R. 145).  Any conflict in the evidence is to be resolved by the ALJ and not the court.  *See Newton*, 209 F.3d at 452; *Brown*, 192 F.3d at 496; *Martinez*, 64 F.3d at 174; *Selders*, 914 F.2d at 617.  To the extent Washington contends, the ALJ properly noted and subsequently discounted the opinion of Dr. Alloju as it was "contrary to the evidence as a whole and specifically an MRI dated March 11, 2005, that reveals no gross paraspinal abnormalities aside from a mild disc bulge at L4-5, a small disc bulge at L3-4, and spondylosis at L5-S1 with moderate foraminal stenosis."  (R. 20).

### 3.  *Development of the Record*

Washington next argues that the ALJ erred by not consulting an ME at the hearing.  *See* Docket Entry No. 13, p. 7.  The ALJ has a duty to fully and fairly develop the record to ensure that he makes an informed decision that is based on sufficient factual evidence. *See Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *see also Newton*, 209 F.3d at 458; *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1996).  The decision of an ALJ will be reversed where that decision is not supported by substantial evidence if the claimant shows " (1) that the ALJ failed to fulfill his

duty to adequately develop the record, and (2) that the claimant was prejudiced thereby." *Brock*, 84 F.3d at 728; *see also Kane v. Heckler*, 731 F.2d 1216, 1220 (5th. Cir. 1984).

Here, substantial evidence demonstrates that the ALJ sufficiently developed the record. Although no ME testified during the hearing before the ALJ, the ALJ looked beyond objective medical evidence alone and asked Washington questions about her subjective complaints; thus, establishing substantial evidence to support his finding that Washington was not disabled. (R. 18-21). The ALJ asked Washington a series of questions, including, but not limited to, what caused her to stop working, where her pain was located, specifically, what about the pain caused her difficulty at her job, how her leg and back spasms caused her difficulty at work, and ended by allowing Washington's attorney to ask further questions regarding the onset of Washington's carpal tunnel syndrome. (R. 251-253, 254, 256). An ALJ can suitably develop evidence without the benefit of a ME by examining objective medical records and by questioning the claimant about subjective complaints. *See James v. Bowen*, 793 F.2d 702, 705-06 (5th Cir. 1986); *see also* 20 C.F.R. § 404.1527(f)(2)(iii). Thus, the combination of the medical records, Washington's direct testimony in response to questions by both the ALJ and her own counsel, sufficiently developed the record without the need for the testimony of an ME. Accordingly, the lack of testimony by an ME in this case is not *per se* a legal error. *See Johnson v. Harris*, 612 F.2d 993, 996 (5th Cir. 1980); *see also* 20 C.F.R. § 404.1527(f)(2)(iii).

Moreover, Washington does not offer evidence or suggest that there is additional evidence that, if developed further by the ALJ, would have changed the end result. *See Brock*, 84 F.3d at 728-29; *see also Glover v. Barnhart*, 81 Fed. Appx. 513, No. 03-20469, 2003 WL 22849826, at *1 (5th Cir. Dec. 2, 2003); *Castillo v. Barnhart*, 325 F.3d 550, 552 (5th Cir. 2003). Additionally,

Washington makes no claim of being prejudiced, nor does Washington offer evidence to demonstrate that she was prejudiced by the ALJ's finding. *See Brock*, 84 F.3d at 728-29; *Ripley*, 67 F.3d at 557 n. 22; *Kane*, 731 F.2d at 1220. Instead, Washington merely suggests that the lack of testimony by a ME is an error. Hence, without additional evidence demonstrating prejudice or the potential for a different result, the facts of this matter do not allow the lack of testimony by an ME to be reversible error. *See Brock*, 84 F.3d at 728-29; *Ripley*, 67 F.3d at 557 n. 22*; see also Castillo*, 325 F.3d at 552; *Kane*, 731 F.2d at 1220.

### 4.   *Obesity*

As to the impact of Washington's alleged obesity on her functional limitations, the ALJ did consider such factors during the administrative hearing and in his decision. After asking Washington's attorney for a theory of disability the ALJ added, "[w]ell, you got her, her weight at the time. She was overweight. Is that right? . . .  So you have obesity, an impairment . . . ." (R. 249). The ALJ also referenced Washington's obesity in his decision. (R. 17, 20).

Moreover, the medical records show minimal notations of Washington's obesity. Washington's weight and height are noted as "5'6' and 313" pounds in 1990.[20] (R. 155). Dr. T. Lowe diagnosed and noted Washington as obese on several occasions. (R. 146, 160). Dr. Alloju reported Washington's weight as 284 pounds in 1999. (R. 210). On February 15, 2001, a CT scan noted that her large size limited the examination of her lumbar spine. (R. 145). On December 27, 2001, an imaging report concluded that the "supine and upright views of the abdomen are limited by the patient's morbid obesity." (R. 169). On January 1, 2002, Washington's weight  was noted as 321 pounds. (R. 168). On December 12, 2002, Dr. Mazique recorded Washington's weight as 318

_____

[20]   Exact date is unintelligible due to bad copy in the record.

pounds.  (R. 177).  On September 25, 2003, Dr. Mazique noted Washington's weight as 309 pounds.
(R. 174).  None of Washington's treating or examining physicians noted that her weight had any effect
upon her existing impairments or limited her functioning.  (R. 18).

The SSA removed 9.09 (obesity) from its list of impairments in 1999, currently, obesity is
relevant primarily in the musculoskeletal, cardiovascular, respiratory, and mental disorders listings.
*See* SSR 02-01p, 2000 WL 628049, at *1 (SSA, Sept. 12, 2002).[21]  SSR 02-01p directs an ALJ to
consider whether obesity, alone or in combination with other impairments, causes a listing-level
impairment in functioning.  *See id.*  Hence, the mere diagnosis of a condition, such as obesity, without
resulting significant functional restrictions, is not disabling within the Act.  *See Barajas v. Heckler*,
738 F.2d 641, 644 (5th Cir. 1984).  Thus, merely being obese is not *per se* disabling.  *See Long v.
Apfel*, 1 Fed. Appx. 326, 332-333 (6th Cir. 2001) (finding that obesity was not a "severe" impairment
even though claimant was 66 inches tall and weighed over 300 pounds).

Here, no testimony or other evidence was elicited to demonstrate that Washington's weight
impaired her ability to work.  Nevertheless, the record indicates that the ALJ did consider her weight
in reaching his decision.  The ALJ found that Washington was limited to sedentary work with
additional limitations ( *i.e.*, occasionally stoop, kneel, and crouch; and, never crawl or climb ropes,

---

[21] Policy Interpretation Ruling, Titles II and XVI: Evaluation of Obesity, SSR 02-01P was issued September
12, 2002, to provide guidance on the SSA policy concerning the evaluation of obesity in disability claims filed
under Titles II and XVI of the Social Security Act.  Although Listing 9.09 (Obesity) was deleted from the
Listings effective October 25, 1999, changes were made to the Listings to ensure obesity was still addressed.
Paragraphs were added providing guidance about the potential effects obesity has in causing or contributing
to impairments in the musculoskeletal, respiratory, and cardiovascular body systems.  The policy interpretation
defines obesity as a "complex, chronic disease characterized by excessive accumulation of body fat."  The
Ruling recognizes obesity can cause limitations in all exertional and postural functions.  It recognizes that
obesity makes it harder for the chest and lungs to expand.  Obesity forces the respiratory system to work harder
to provide oxygen to the body, in turn making the heart work harder to pump blood and carry oxygen to the
body.  The Ruling recognizes obesity can increase the severity of coexisting or related impairments.

ladders, or scaffolding).  (R. 18).  The RFC determination sufficiently compensated for Washington's obesity.

## III.   *Conclusion*

In sum, the record provides substantial evidence supporting the Commissioner's decision that Washington is not disabled.  Accordingly, it is therefore

**ORDERED** that Washington's Motion for Summary Judgment (Docket Entry No. 13) is **DENIED**.  It is further

**ORDERED** that Commissioner's Motion for Summary Judgment (Docket Entry No. 14) is **GRANTED**.  It is further

**ORDERED** that the Commissioner's decision is **AFFIRMED**.  Finally, it is

**ORDERED** that this matter is **DISMISSED** from the docket of this Court.

**SIGNED** at Houston, Texas, this 10th day of July, 2007.

Calvin Botley
United States Magistrate Judge

24